Gary C. BASS, Plaintiff,

v.

Patricia Roberts HARRIS, Secretary, United States Department of Health and Human Services, Defendant.

No. C–C–79–376.

United States District Court, W. D. North Carolina, Charlotte Division.

Dec. 19, 1980.

Hugh G. Casey, Jr. and Jeffrey L. Bishop, Charlotte, N. C., for plaintiff.

Wayne C. Alexander, Asst. U. S. Atty., Charlotte, N. C., for defendant.

## JUDGMENT

McMILLAN, District Judge.

Gary C. Bass filed an application on May 3, 1978, for disability benefits under the Social Security Act (Tr. 151). The application was routinely denied without a hearing (Tr. 155); it was denied on reconsideration; and plaintiff requested a hearing. The case was heard before an administrative law judge on July 5, 1979. The administrative law judge filed an eighteen–page single–spaced decision (Tr. 7–25), denying recovery and finding that plaintiff was not under a compensable disability. The Appeals Council affirmed on October 10, 1979 (Tr. 4) and the administrative law judge's decision thereby became the final decision of the Secretary of Health and Human Services. Plaintiff brought this suit challenging the action of the Secretary and requesting the court to order that he be paid appropriate benefits. The case was heard in this court on November 13, 1980. Briefs have been filed and the case is now ready for decision.

## THE EVIDENCE

Plaintiff, Gary C. Bass, was born in 1928, has a tenth grade education, is 5'–5" tall and weighs around 155 pounds. He is married and has two grown children. He lives in Charlotte (Tr. 55–55). After leaving high school he worked part time for the A & P Tea Company for two or three years; he was then drafted into the Army and served in Korea in the Eighth Regiment of the First Calvary Division.

On Sunday, July 8, 1951, while on that military assignment, he was shot twice in the right knee by a Chinese soldier with a machine gun. The injuries severed a main artery and nerve, and later made necessary the amputation of the right leg at the knee joint level. After a period of convalescence and some work at the officers' club in Fort Bragg, North Carolina, he was discharged from the Army (Tr. 56–57). He got a job working for Duke Power Company in their Charlotte office, in a clerical capacity, maintaining files and recording deeds and other papers in connection with the land transactions of that employer (Tr. 58, 90, 84–91). He worked for Duke Power Company from 1954 until the end of May, 1978, at which time he was retired on account of his long–standing and increasing physical and emotional disabilities. (Tr. 58 et seq.).

For his twenty–four years of service with Duke Power Company he draws a retirement benefit consistent with his employment contract with Duke.

For getting his leg shot off in the Korean War, he draws disability benefits from the Veterans' Administration consistent with VA policy.

His present claim, which must be considered independent of those other separately funded entitlements, is a claim for statutory social security benefits for a period of total disability beginning in the summer of 1978 and continuing thereafter.

The plaintiff's job at Duke Power Company was a clerical job requiring sitting, standing and walking. His job was a combination of bookkeeping, filing, recording and accounting (Tr. 86–88). He would go from his desk to the various files, would handle telephoning and answer inquiries; would stamp and record documents received; maintained ledgers; made records; and supplied information (Tr. 87–91). He worked at his desk about half the time and was "up and moving about half the time" (Tr. 88). Although he had never given the subject much thought, he "imagined" in response to a suggestion from the administrative law judge that chances for promotion would be "slim"; his supervisor was just a year older than he (Tr. 91).

Bass had a lot of contacts with doctors. About 1973 he was discovered to have a cancer of the colon. This was removed by Dr. Keller (Tr. 93). The surgery left him with chronic intermittent diarrhea which causes problems of incontinence at work and at home (Tr. 71, 72, 191).

In 1974 his gall bladder had to be removed, again by Dr. Keller. Dr. Keller still sees him annually for a check–up on account of the original malignancy. He is an "occasional only" drinker. He has attacks of diarrhea several times a month

which may cause bowel movements seven or eight times a day (Tr. 73), and which often result in soiling his clothes.

He has a partly fused lumbosacral joint (Tr. 121, 189). Through the twenty–four years of walking on his arthritic leg he has developed arthritis in the low back and hips, which produces severe pain and insomnia (Tr. 59). He also has pain in his good knee and his good ankle (Tr. 59, 60). That pain has increased through the years.

Various doctors have prescribed various drugs, including Darvocet, for pain (Tr. 60). This makes him groggy and sleepy. He has to take three to six of these pain pills each day. This pain may occur at all times but is normally worse in the late afternoon. He has phantom pains in the "foot" of his missing right leg.

Sometimes the artificial leg malfunctions and is unstable and results in falls (Tr. 65, 66, 67). He has had falls in the soda shop, on the elevator and elsewhere, and he sometimes uses crutches. He broke a finger in one such fall (Tr. 68). He has back pain even when sitting down (Tr. 68), and in driving a car (Tr. 68–69). Carrying weights of even as little as five pounds is risky because of the problem of balance and the possibility of falling (Tr. 69–70).

During the first two decades or so of his post–war life he engaged in many physical activities such as handyman work, painting, coaching Little League baseball, gardening and cutting the grass. In the late 70's he had to give up "all those little projects" that he enjoyed so much (Tr. 71).

In recent years he has suffered from frequent periods of depression; he cries easily (Tr. 75), twice a week or so. His periods of depression come on without warning and last for two or three hours (Tr. 76). He has a recurring rash on his forearms and one leg. This rash requires medication. His back pain radiates into his hip (Tr. 76–77).

His medication, described for the administrative law judge on pages 77–84 of the record, includes Valium for nerves, three or four times a week; Atarex and Cordran, a cream for the itching and rash; Dalmane to help him sleep; Azene for nerves; and Corectol for constipation (Tr. 84). He does not take all these medicines all the time because he does not wish to become addicted (Tr. 81). His orthopedic surgeon, Dr. Miller, told him that his developing arthritis was a natural consequence of the amputation and his advancing years. The prescribed exercises did not give him much in the way of good results (Tr. 92–93).

He occupies himself essentially with low key activity at home plus trips to the shopping center and post office and such places (Tr. 96–98). The rash has appeared on his arms and on the back of his head and on the stump of his right leg and on his left leg (Tr. 102–3). He had visited Dr. Mize, his most recent attending physician, "probably ten times" in the year before the hearing (Tr. 104).

Mrs. Martha Bass, plaintiff's wife, testified briefly (Tr. 106 *et seq.*) in corroboration of the plaintiff's complaints of limitation of physical activity and his other contentions.

At an adjourned hearing the testimony of Dr. Edwin S. Mize was taken. He has seen the patient regularly since October, 1977. His history was of progressive back pain, depression, anxiety, headaches, insomnia and loss of appetite. He also complained of tinnitus, or ringing in the ears; vertigo; body tremors and tension, diarrhea and fatigue (Tr. 115–119). Dr. Mize had prescribed various drugs for nerves, for pain, and for muscle relaxation. He described a deterioration in plaintiff's personal habits, a marked restriction in his daily activities; a tendency to become more isolated and a reduction in his interests (Tr. 120). The medicine taken for pain dulls his mental faculties and reasoning. This condition has not gotten better but is getting progressively worse (Tr. 121). He has fine tremors in his hands. In the doctor's opinion he would have difficulty in stooping and lifting and in doing things that require fine manual dexterity. He is also subject to pain if he sits in one position very long (Tr. 121). The medication which he takes for pain and depression, pursuant to prescriptions by doctors, causes him to have problems with

his judgment, reasoning and thinking (Tr. 123). Dr. Mize had made a record of seeing the plaintiff fifteen times from October 26, 1977, until April 26, 1979, when he testified in the case. However, he thought he had seen him and talked with him on the phone a good many other times. He has prescribed various drugs which the plaintiff was taking and had attempted to regulate those drugs appropriately (Tr. 127 *et seq.*).

He gave plaintiff the drug Haldol, an anti–depressant. The doctor testified (Tr. 134) that the drug "is usually reserved for those people that are either psychotic or borderline psychotic behavior, and I think this is what Mr. Bass was manifesting the last time that I saw him back in this month of April and the first time that I gave it to him back in November of '78." He further said (Tr. 133):

"A. I think it was quite obvious, too, that his–the stress on his back was coming because of his amputation and the years that he had put in trying to function and the effects of it.

"Q. I see.

"A. I find with several of the amputees and the disabled–I see these in a–in a special light. I think they make such effort to do what we do reflexly and normally in our daily existence over a period of years this–this costs–they pay a price for this, I think, both emotionally and physically. I think this–this man has–has worked his–his due, and I think now the price is–is being paid.

"Q. Did you recommend that he retire?

"A. Yes, I did."

He further said (Tr. 135): "It's been such an insidious thing with him. It's not something that just overwhelmed him over night. This has built up."

(Dr. Mize, under gratuitous questioning by the administrative law judge, admitted that in 1974 his license to practice medicine had been temporarily revoked but had been restored after five months. In brief explanation he testified that the facts on which he was convicted were that a student for whom he had prescribed diet pills on several occasions was caught selling those pills, and the court found his prescription to have been illegally issued. He had been practicing medicine regularly since the five–month suspension in 1974.)

No doctor other than Dr. Mize testified in person.

Reports were, however, received in the record from various sources:

(1) A disability claim examiner named Jan Hanner expressed the written opinion that claimant can perform his customary past work. It is not supported by medical or other evidence from anybody who is shown by the record to have ever examined or treated or seen the plaintiff (Exhibit 13, Tr. 185–86).

(2) Another disability claim examiner, Theresa Farlan, said plaintiff was not disabled. However, the report is likewise now shown to have been based upon any personal knowledge or other examination (Tr. 187–88).

Plaintiff's objections to the consideration of the opinions of Hanner and Farlan were overruled.

(3) Dr. Robert L. Miller, orthopedic surgeon (Exhibit 15, Tr. 189), confirms the plaintiff's history of pain in the back and legs, the fusion of his fifth lumbar vertebra and his general depression. This report was dated November 10, 1977, while the plaintiff was still at work.

(4) Dr. Mize (Tr. 190) (report written by a disability claim examiner as the substance of a telephone conversation with Dr. Mize). This includes the statements (not recognized in the opinion of the administrative law judge) that plaintiff's low back pain was "becoming increasingly worse"; that he was "quite fatigued at the end of the day now"; that the claimant was "depressed"; that he has moderate osteoarthritis; that he is "nervous and depressed"; the "[d]octor states he has almost chronic depression. No really abnormal behavior but depressed from longstanding pain which is becoming increasingly worse with no relief. *Doctor states claimant has not been a com-*

*plainer and was worked as long as he possibly could* [emphasis added]."

\* \* \* \* \* \*

"His nervousness causes no abnormal behavior but he is chronically depressed with some depressive affect due to the constant pain and inability to continue working now."

This report was signed by Dr. Mize.

(5) A "PHYSICAL CAPACITIES EVALUATION" (Exhibit 17, Tr. 192) was received in evidence but it merits slight consideration only, because it was made up by somebody who never saw the plaintiff and never talked with him or examined him and therefore is not competent to be considered on the disability question.

(6) Dr. Gary G. Poehling, Orthopedic Consultant for the Veterans' Administration, wrote a report for the defendant on July 5, 1978 (Tr. 197), after a physical examination. He summarized the orthopedic findings, noted for the first time evidence of "degenerative disc disease at L5/S1," and concluded with the following: "As far as the patient's unemployability, I feel that the primary reason of his unemployability is secondary partially because of his low back but primarily because he is also having difficulty with his nerves at this time, and this is not SC."

(7) Dr. Charles Edwards (Tr. 199–200) examined the plaintiff on September 19, 1978. He expressed no opinion that the plaintiff was able to return to his former work or any other work, but he did confirm and record a number of the previous complaints and previously recorded medical observations, including the following:

"\* \* \* [H]e speaks very slow with a sad and dejected appearance.

"He stated that he was forced to retire from his job in May of this year because of accumulating problems. He described these as having been getting worse for 4 or 5 years. He said that he has had persistent back pain which radiates down into his legs. He says he feels dejected, 'despondent', that he cries frequently, and feels frustrated and angry that he can't do things that he used to. He has had marked insomnia, indifference to food, severe loss of libido. He gets tired easily and feels weak most of the time. He lost interest in hobbies and cannot motivate himself without great effort. He says this gradually has gotten worse to the point where he felt he simply must give up and quit his job. . . .

\* \* \* \* \* \*

"\* \* \* He described himself as a somewhat obsessive, and very orderly man who demands a great deal out of himself and that he was failing in his own expectations. \* \* \*

\* \* \* \* \* \*

"MENTAL STATUS: On mental status exam he is a pleasant, somewhat dejected man who is oriented in all three spheres. His memory is intact. There is no evidence of organicity. There is a moderate degree of psychomotor slowing reflected in both his physical as well as his verbal appearance. He is dejected. He says that he thinks a good deal about being wasted and useless. He feels that he has outgrown his usefulness and has very little in the future left. He says he cannot motivate himself any longer to work. He has had some occasional death wishes but no suicidal attempt. He has no evidence of psychotic ideation or paranoid thinking. His judgment is within normal limits. He abstracts well. He does simple calculations slowly but accurately. He has a fair amount of insight into his problem.

"Diagnostically, he appears depressed to a moderate degree. He is taking care of his own personal needs. He has decrease [sic] somewhat in sphere of interests. He is able to relate reasonably well to others and understand simple instructions. He has difficulty in maintaining his concentration and attention and carrying out other than simple tasks. The man has very little motivation at this point to work and admits that since he was given 100% disability by the VA a month ago all he hopes for now is to draw his Social Security which he feels like he

has earned and is due him at this point, and then he plans simply to retire."

(8) Dr. Guy O. Keller, plaintiff's surgeon (Tr. 212–13) filed a report that concluded with the observation that " * * * an individual who has had an above knee amputation and has worn a prosthetic appliance for a number of years is prone to develop arthritic problems and I would certainly believe lower back pain could well be a sequela."

(9) Dr. Gerald A. Reynolds, practicing psychologist, did some psychological reports and conducted some stock tests which he interpreted (Tr. 215–16). A copy of Dr. Reynolds' report is attached and is self–explanatory. He commented on plaintiff's emotional problems or obsession with regard to his inability to control his bowel movements in public, his "lack of sharpness mentally"; his "frequent vagueness where he should have been able to answer correctly"; that he "just seemed to have difficulty controlling attention"; and "he seems to have lost confidence but also reality testing to some extent also."

Dr. Reynolds' *"Impression"* was

" * * * that of depression with considerable mental impairment. His slowness, lack of control of attention, errors on arithmetic which he should know and solve, being reduced to answering in simple and concrete fashion in both the intelligence and projective tests, fear and avoidance of professing what he really thinks for fear that this is inadequate and perhaps unrealistic all point to impairment. In some respects he seems close to a psychotic condition but he is oriented. He does reflect, however, a number of nonpsychotic functional disorders which add up to considerable impairment; his daily activities and interests are materially constructed by his depression and his ability to relate socially is severely impaired by the depression and attempted avoidance of embarrassment; obsessive ruminations; and seclusiveness and avoidance of reality testing. In essence, the patient has been withdrawing more and more, with the net effect that he has reinforced his own personal ideas about reality or indulged in autism."

## RE–CAP OF MEDICAL EVIDENCE

There is not a single opinion by a single examining doctor to the effect that plaintiff is able to return to or perform the duties which with one leg he did perform for twenty–four years at Duke Power Company.

There is not a word of testimony that the plaintiff is able to work.

There is not a medical report from an examining physician which says or will support a finding that plaintiff is able to work.

There is not a suggestion in any of the reports that the plaintiff is malingering or faking or in any way trying to sell anybody a bill of goods.

Even Dr. Charles Edwards, who examined the plaintiff for the defendant, substantially corroborated the plaintiff's own contention and that of other doctors that plaintiff can no longer push himself, on his artificial leg and with his pain and other complications, to work any longer (Tr. 200).

The only words in the record which even hint that plaintiff can work are those of (a) "A. A. Allen, M.D." who never saw the plaintiff and whose testimony was confined to mechanical acts that he figured from the record plaintiff could perform, and (b) the "DISABILITY DETERMINATION AND TRANSMITTAL" forms (Tr. 185–88) which are made out by disability examiners who never saw the plaintiff and whose testimony will not support the conclusion reached by the administrative law judge.

## THE OPINION OF THE ADMINISTRATIVE LAW JUDGE

The administrative law judge's opinion is amazing. It is eighteen single–spaced pages in length.

It is in many spots combative in nature and hostile in tone. It takes note of and appears to rely upon a number of gross irrelevancies, including the following:

(a) The "little sting in his leg," which plaintiff felt at the moment of the gunshot wounds which destroyed his lower leg was not as great as the pain he feels now (Tr. 12).

(b) He took exception, wholesale, to Dr. Mize, and called him an "advocate" because Mize advised plaintiff to appeal from the denial of his social security benefits.

(c) He went to considerable pains to make a record of Mize's five–year–old conviction for overprescribing drugs.

(d) He attributes plaintiff's loss of drive and motivation to work to the fact that he is getting disability payments for his lost leg from the Veterans' Administration.

(e) He appears to know more medicine than the doctors, being an expert in bowel disturbances following colon surgery for cancer. He suggests without evidence that plaintiff's bowel problems may be based upon advertisements of laxative manufacturers to expand their market!

(f) He "doubts seriously" that plaintiff could acquire a better artificial leg than the one he has.

(g) Contrary to the medical evidence that walking on an artificial leg tends to produce and aggravate arthritis, he concludes (Tr. 21) that "claimant's limitations due to being one–legged, standing alone, are *the same as they have been ever since he lost his leg.*"

(h) He appears to treat as insignificant the massive problems of emotion, nerves, and drug control, which were attested to by plaintiff and his several doctors.

(i) From the plaintiff's "appearance at the hearing" he diagnosed his emotional problems as being "no more than mild depression."

(j) He appears to assume that short of psychosis, plaintiff's mental impairment cannot be disabling.

(k) He suggested that the various medications which Dr. Mize and the plaintiff both testified they tried carefully to balance and control may have reached "a point where the treatment can be worse than the disease."

(*l*) He complains because the plaintiff's Veterans' Administration benefits for losing his leg are "not subject to income tax as are earnings from gainful employment."

(m) He gratuitously and without substantial supporting evidence described plaintiff's job as a "routine, dead end job with Duke that he had been doing for some time, no prospects of advancement, a job where his pay could be expected to increase only as cost–of–living adjustments were made."

(n) He appears distressed because in addition to VA benefits, plaintiff "gets *benefits* (sic) from Duke Power Company." These "benefits" are plaintiff's contractually earned *retirement* payments, based upon twenty–four years of service.

(*o*) He concludes, without evidence, that "claimant's work was not so physically strenuous or mentally taxing as to be that fatiguing *unless an emotional antipathy had developed toward the work*" (emphasis added).

This court has great difficulty finding in the record evidence to support the administrative law judge's tirade against the plaintiff and against the testimony of Dr. Mize.

This court has *no* trouble finding in the record (a) overwhelming evidence to justify an award of benefits and (b) an absence of evidence that the plaintiff is able to return to his former work.

The determination of the Secretary that the plaintiff is not disabled is not supported by substantial evidence.

IT IS ORDERED that defendant's motion for summary judgment is denied. Plaintiff's motion for summary judgment is granted. Defendant will compute and pay appropriate benefits.